UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DOUGLAS
BENTSCHNEIDER,

                Plaintiff,        Civil Action No. 16-12038
                                     Honorable Gershwin A. Drain
                                     Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 11]**

        Plaintiff Robert Douglas Bentschneider ("Bentschneider") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #9, #11), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

        For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Bentschneider is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Bentschneider's Motion for Summary Judgment [9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On September 17, 2013, Bentschneider filed an application for DIB, alleging a disability onset date of January 1, 2006. (Tr. 11, 27, 62, 69, 162, 166, 191). This application was denied at the initial level. (Tr. 69). Bentschneider filed a timely request for an administrative hearing, which was held on November 24, 2014, before ALJ Paul W. Jones. (Tr. 22-61). Bentschneider, who was represented by non-attorney representative Brian Christie, testified at the hearing. (*Id.*). Vocational expert Norman Abeles was present at the hearing but did not testify. (*Id.*). On December 19, 2014, the ALJ issued a written decision finding that Bentschneider is not disabled under the Act. (Tr. 7-19). On May 3, 2016, the Appeals Council denied review. (Tr. 1-4). Bentschneider timely filed for judicial review of the final decision on June 4, 2016. (Doc. #1). On September 16, 2016, Bentschneider filed a Motion for Summary Judgment. (Doc. #9). The Commissioner filed a Motion for Summary Judgment on November 18, 2016. (Doc. #11).

### B. Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or

>mental ability to do basic work activities," benefits are denied without further analysis.
>
>Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
>Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.  Background**

*1.  Bentschneider's Reports and Testimony*

At the time of the administrative hearing, Bentschneider was 64 years old, 5'8'' tall, and weighed 211 pounds.  (Tr. 27-28).  He lived in a one-bedroom condominium by himself.  (Tr. 28, 183).  He testified that he has lived alone for about 21 years.  (Tr. 29).  Bentschneider's highest level of education is twelfth grade.  (Tr. 33, 167).  He worked at Jacobson's warehouse for three years, packing and unpacking boxes, until March 1, 2002, when the company went out of business.[1]  (Tr. 30-31, 41, 53, 166).  He then tried looking for another job during the next two or three years but was unable to find one.  (Tr. 31, 56).  He testified that prior to Jacobson's

---

[1] Bentschneider testified that he believed that, had he not been a union member, Jacobson's would have fired him earlier because his conditions caused him to miss work.  (Tr. 57-58).

3

closing, he had worked his "entire life." (Tr. 40). He held numerous jobs in factory or warehouse settings, even though five of his employers went out of business. (Tr. 40-41, 52, 56, 167, 175-82).

Bentschneider alleges disability as a result of various physical conditions, including gout in his feet and knees, vasodepressor syncope, and hyperaldosteronism. (Tr. 166). He testified that in 2006, he started getting gout.[2] (Tr. 32, 45). He described it as "totally crippling for about two to three days" (Tr. 45) and said it usually takes around one week to get over it completely. (Tr. 49). He stated that whenever he gets an outbreak, he has to stay on the couch or a chair until the pain eases up. (Tr. 183). It is very hard to walk and stand, and he has to use a walker. (Tr. 49, 183, 189). The walker is not medically prescribed, but he has seen Dr. Conant and gone to the emergency room for treatment. (Tr. 45-46, 189). According to Bentschneider, the pain during an outbreak makes it "impossible" for him to get in the car and travel to see a doctor. (Tr. 46, 190). Dr. Conant has given him medication for this, so he doesn't go to Dr. Conant every time he has an outbreak. (Tr. 46, 50, 190). He reported that the longest he has gone without experiencing an outbreak is three months. (Tr. 49).

Bentschneider testified that he was diagnosed with vasodepressor syncope in 2000 and continues to have it. (Tr. 41-42). This condition makes his blood pressure drop and makes it so that he can't stand still for a long time. (Tr. 41, 183). It also makes him feel like he is going to faint. (Tr. 41). At one point, he experienced fainting spells every day; at others, it was every other day or once a month. (Tr. 47). He indicated that there has never been a time where he did not experience them. (Tr. 48). Similar to when he has a gout outbreak, he stated that he does not

---

[2] Later in the hearing, he testified that he has had gout since 2004 or 2005. (Tr. 50).

4

always see a doctor when his blood pressure drops; instead, he sits down for a while "until [it] passes." (Tr. 190).

Bentschneider testified that in 2006, he was diagnosed with hyperaldosteronism, a hormone imbalance in the kidneys that causes his blood pressure to go up and down and that is possibly linked to his vasodepressor syncope. (Tr. 32, 42-43, 183). For years he has taken Aldactone, which he said "does help" balance his hormones, "but it's not really an answer." (Tr. 32-33, 43). He testified that he still has problems: it makes him use the bathroom "quite often,"[3] his blood pressure fluctuates, and his "kidney functions are down a little bit." (Tr. 32, 43). In addition, this medication makes his chest sore. (Tr. 43).

In addition to Aldactone, Bentschneider takes several other medications, including Lasix (for water retention), Lipitor (for cholesterol), Toprol (for blood pressure), Motrin (for gout outbreaks), and Tylenol #3 (for gout outbreaks and pain). (Tr. 169, 190). The only side effects he listed were frequent urinations from the Lasix and drowsiness from the Tylenol #3. (Tr. 190).

Bentschneider indicated that on an average day, he takes care of his mother at her house and does "light" household chores at his house for twenty minutes once a week. (Tr. 30, 184-85). In addition to being his mother's caregiver, he helps take care of his granddaughter when he is able to and doesn't have a gout outbreak. (Tr. 184). He prepares his own meals (frozen dinners) daily. (Tr. 185). He does laundry for about two hours once a week. (Tr. 30, 185). When doing housework, he sometimes needs help or encouragement. (Tr. 185). Sometimes his daughters help him. (Tr. 30).

---

[3] Bentschneider testified that he uses the bathroom "as much as about every 20 minutes," and that this was the case in 2006 and 2007. (Tr. 43-44). As a result, when he takes Aldactone, he often stays local or at home. (Tr. 44). On the day of the hearing, he did not take it. (*Id.*). In fact, he did not take any of his medications; he said that if he had, he "couldn't make it" to the hearing. (*Id.*). But he said that he typically takes Aldactone every day, as prescribed. (*Id.*).

Gout outbreaks affect Bentschneider's sleep and make it painful to bathe, get dressed, and use the toilet. (Tr. 184). Otherwise, he has no problems with personal care. (*Id.*). Gout outbreaks also affect his ability to lift, squat, bend, stand, walk, kneel, and go up stairs. (Tr. 188). When he has gout, he can walk about ten feet. (*Id.*). He needs to rest two to three minutes before he can resume walking. (*Id.*). Bentschneider goes outside daily, except for when he has gout. (Tr. 186). He estimated that in 2007 he did not leave his house three days a month due to gout. (Tr. 52). He travels by car, can drive, and can go out alone. (Tr. 186-87). He does not need reminders to leave his house. (Tr. 187). Once a week, he shops in stores for groceries and household items. (Tr. 186). He is able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). He has no problems with written or spoken instructions (Tr. 188) and handles stress and changes in routine "ok." (Tr. 189). He can pay attention for thirty minutes but does not finish what he starts. (Tr. 188). He listed no hobbies. (Tr. 187). He indicated that he has no problems with social interactions and regularly spends time with others: once a week he goes to church, and three to four times a week he gets together with friends at a restaurant. (Tr. 187-88). He also indicated that he has no problem getting along with authority figures and has never been fired due to problems getting along with others. (Tr. 189).

        2.    *Medical Evidence*

The Court has thoroughly reviewed Bentschneider's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

    **D.**    **The ALJ's Findings**

At Step One of the five-step sequential analysis, the ALJ found that Bentschneider has not engaged in substantial gainful activity between January 1, 2006 (his alleged onset date)

through June 30, 2007 (his date last insured). (Tr. 13).

At Step Two, the ALJ found that Bentschneider suffered from diverticulosis, hypertension, hyperlipidemia, mild degenerative joint disease of right shoulder, and gout. (*Id.*). However, the ALJ found that none of those impairments, either singularly or in combination, significantly limited his ability to perform basic work-related activities for 12 consecutive months. (Tr. 13-15). Thus, the ALJ found that Bentschneider's impairments were not "severe," and, accordingly, that he was not disabled under the Act during the relevant time period. (*Id.*).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

7

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or the court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F. Analysis**

In his motion for summary judgment, Bentschneider argues that the ALJ: (1) should have found his impairments to be "severe" at Step Two because they interfered with his ability to work; and (2) failed to properly evaluate his credibility.[4] These arguments are addressed below.

> 1. *Substantial Evidence Supports the ALJ's Step Two Determination that Bentschneider did not have a Severe Impairment or Combination of Impairments*

As noted above, Bentschneider has the burden of proof at Step One through Step Four, which means that he has the burden of proving the existence and severity of the limitations caused by his impairments. *McCleary v. Comm'r of Soc. Sec.*, No. 1:14-CV-1197, 2015 WL 9463194, at *2 (W.D. Mich. Dec. 28, 2015). Bentschneider argues that his impairments are "severe" because the record demonstrates that they "*interfered* with his ability to work." (Doc. #9 at 14) (emphasis in original). He also argues that objective medical evidence supports "his description of work impairments." (*Id.*). These arguments lack merit.

First, the portion of Bentschneider's summary judgment motion addressed to this argument fails to cite a single medical record. (*Id.*). But even liberally construing Bentschneider's motion as a whole, it is clear that the ALJ's findings are supported by substantial evidence. At Step Two of the sequential evaluation, the ALJ considers the "medical severity" of a claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii); *Soc. Sec. Rul. 85-28*,

---

[4] In a separate section of his summary judgment motion entitled "The ALJ Failed to Properly Evaluate the Medical Evidence," Bentschneider argues that the ALJ "erred when he ignored medical records and reports showing [he] suffered from vascodepressor syncope, hyperaldosteronism, and gout; all before his date last insured of June 30, 2007, all showing more than a *de minimis* interference with work activity." (Doc. #9 at 16). But that single sentence was the entirety of this "argument"; Bentschneider does not elaborate on it, and he does not include citations to the record, case law, or regulations to support it. The Court therefore need not address it. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotations omitted). At any rate, as discussed below, the ALJ properly considered the limited medical evidence in the record pertaining to the time frame before Bentschneider's date last insured. *See infra* at 11-15.

1983-1991 Soc. Sec. Rep. Serv. 390, at *3 (Jan. 1, 1985). To surpass Step Two and move on to Step Three, the ALJ must find that a claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."[5] 20 C.F.R. § 404.1520(c); *McCleary*, 2015 WL 9463194, at *3. The Act's "duration requirement" is found in 20 C.F.R. § 404.1509 and provides that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. Where the claimant is applying for DIB, "the 12-month period may be any period of 12 months, so long as the period starts prior to the expiration of the claimant's insured status. The only requirement is that the 12 months must be consecutive." Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law & Procedure in Federal Court* § 2:6

---

[5] "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," for example:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b); *Soc. Sec. Rul. 85-28*, 1983-1991 Soc. Sec. Rep. Serv. 390, at *3 (Jan. 1, 1985). "[T]hese basic work factors are inherent in making a determination that an individual does not have a severe medical impairment," since "[t]he severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs." *Soc. Sec. Rul. 85-28*, 1983-1991 Soc. Sec. Rep. Serv. 390, at *3 (Jan. 1, 1985).

(2017 ed.); *Lyons v. Soc. Sec. Admin.*, No. 00-5361, 19 F. App'x 294, 300 (6th Cir. Sept. 13, 2001).

"The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out 'totally groundless claims.'" *Griffeth v. Comm'r of Soc. Sec.*, No. 06-1236, 217 F. App'x 425, 428 (6th Cir. Feb. 9, 2007) (citing *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). As a result, the Step Two severity determination is "a *de minimis* hurdle," requiring the claimant merely to show that a particular impairment more than minimally impacts her ability to perform work-related functions. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "Under a Social Security policy ruling, if an impairment has 'more than a minimal effect' on the claimant's ability to do basic work activities, the ALJ is required to treat it as 'severe.'" *Griffeth*, 217 F. App'x at 428 (citing *Soc. Sec. Rul. 96-3P*, 1996 WL 374181 (July 2, 1996)). Still, a finding that either the severity requirement or the duration requirement is not met will lead to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). Thus, to meet her burden at Step Two, the claimant "must show both that her impairment has significantly limited her ability to do basic work activities *and* that she has an impairment that has lasted or is expected to last for a continuous period of at least twelve months." *McCleary*, 2015 WL 9463194, at *3 (citing *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012)) (emphasis added).

Here, the ALJ concluded at Step Two that Bentschneider did not have a severe impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for 12 consecutive months. (Tr. 13). Specifically, the ALJ cited medical records from December 2006 and April 2007 and pointed out that Bentschneider "presented very few medical records pertaining to the relevant time frame" to support his allegation that he is

disabled due to gout, kidney issues, high blood pressure, vasodepressor syncope, and hyperaldosteronism.[6] (Tr. 14-15). In December 2006, Bentschneider complained of rectal bleeding and had a colonoscopy revealing six polyps, which were removed. (Tr. 14). Shortly after, he had another colonoscopy due to further bleeding and was diagnosed with diverticulosis and post-polypectomy bleed. (*Id.*). The ALJ noted that Bentschneider "sought no further treatment for his gastrointestinal issues under the pertinent time period." (*Id.*). In April 2007, Bentschneider experienced shoulder pain and had an X-ray showing minimal degenerative joint disease manifested by small spurring on the inferior lip of the glenoid, "but an otherwise unremarkable shoulder." (*Id.*). That same month, an X-ray of his chest revealed no hydronephrosis; no evidence of splenic, pancreatic, or adrenal masses; no enlarged lymph nodes or hylar mass; and renal cysts. (*Id.*). Physical examinations from the relevant period recorded Bentschneider as having a regular heart rate and normal sinus rhythms, and as being a "healthy appearing male." (*Id.*). The ALJ counted no gout flare ups and only three references to Bentschneider having high blood pressure during the time frame at issue. (Tr. 15).

---

[6] The ALJ also noted the limited number of relevant medical records during the administrative hearing. (*See* Tr. 38, 46-47, 50-51). Bentschneider did not effectively rebut this with references to medical evidence in the record. Bentschneider's non-attorney representative appeared to try to counter this with testimony. (*See, e.g.*, Tr. 46). But a "medically determinable" impairment at Step Two "must be established by objective medical evidence from an acceptable medical source" and is not established by the claimant's statements. 20 C.F.R. § 404.1521. Still, the ALJ took Bentschneider's testimony into account and analyzed it together with the record when issuing his decision that Bentschneider was not disabled:

> Although [Bentschneider] provided significant testimony regarding his gout flare-ups, which he stated render him crippled, the medical record mentions only a "history of gout" during the relevant period . . . . There is no evidence of treatment for flare-ups or that his gout is anything but dormant before [his] date last insured.

(Tr. 15).

The ALJ noted that other medical evidence in the record references Bentschneider's cardiac functioning, gout, and gastrointestinal issues, but pertains to a period after the date last insured, so "it cannot be used to determine disability before, or on, [that date]." (Tr. 14). The ALJ therefore concluded that "of the few relevant medical records [Bentschneider] presented[,] none support a conclusion that [he] is more than minimally limited in his ability to perform work related functions." (Tr. 15). Accordingly, the ALJ found that Benschneider was not disabled between January 1, 2006 and June 30, 2007 and the sequential analysis therefore ended at Step Two. (*Id.*).

Substantial evidence supports the ALJ's Step Two determination that Bentschneider's impairments were not severe because they did not meet the duration requirement. For Bentschneider to prevail at this stage on his claim that he had a severe impairment, he had to show that his impairment began before June 30, 2007, his date last insured, "and [it] must have continued unabated for at least 12 months." *Lyons*, 19 F. App'x at 300. Bentschneider does not make this showing. He has provided seven medical records from the relevant time frame: five of them are from December 2006 (Tr. 280-81, 283-86, 288-92) and two are from April 2007. (Tr. 237-38, 282). Even if they were for the same medical conditions – which they are not – because these records are only four months apart, they support the ALJ's finding that Bentschneider did not satisfy the 12-month consecutive duration requirement. More importantly, these records are primarily for medical conditions, such as gastrointestinal issues and shoulder pain, for which Bentschneider is not alleging disability. The ALJ's Step Two finding is therefore supported by substantial evidence.

The ALJ accurately summarized the content of the December 2006 and April 2007 records in his decision, and they do not indicate that Bentschneider suffered from a severe

impairment for 12 consecutive months. (Tr. 14, 237-38, 280-82, 283-86, 288-92). As the ALJ pointed out, these records noted Bentschneider's positive physical exams and healthy appearance (Tr. 14, 281, 285, 290, 292) and listed him having a history of hypertension, hyperlipidemia, and gout, "but mentioned no further treatment or symptoms elicited by these."[7] (Tr. 14, 284, 289, 291-93).

The ALJ also appropriately addressed the opinions in the record of other physicians. Medical consultant Donald Kuiper, M.D., opined that Bentschneider failed to provide sufficient evidence during the relevant time period to establish he was disabled. (Tr. 67). For the reasons stated above, that finding is supported by substantial evidence. The record also includes an August 24, 2005 "to whom it may concern" note from Hasan Qutob, M.D., who apparently treated Bentschneider between 2000 and 2005.[8] (Tr. 337). In that very brief note, Dr. Qutob wrote that Bentschneider was not a good candidate for jury duty because he could not sit for long periods of time without a restroom break due to his "kidney problems." (*Id.*). An ALJ must give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). *See also* 20 C.F.R. § 416.927(c)(3), (4). Here,

---

[7] Even though later records indicate that Bentschneider received treatment for gout and blood pressure issues (*see, e.g.*, Tr. 197-202, 205, 242, 295-96, 298, 302-07, 311, 313-15, 317-18, 324-25), this does not change the analysis above because these records are from "after [Bentschneider's] date last insured and thus [are] outside the relevant time period." *McCleary v. Comm'r of Soc. Sec.*, No. 1:14-CV-1197, 2015 WL 9463194, at *4 (W.D. Mich. Dec. 28, 2015) (finding that where the plaintiff's condition might have worsened after the date last insured, this was outside the relevant time period, so substantial evidence supported the ALJ's conclusion that the plaintiff did not suffer from a severe impairment that met the 12-month duration requirement to satisfy the requirements of Step Two).

[8] Bentschneider made no explicit challenge to the ALJ's compliance with the treating physician rule. However, for completeness, the Court will address the ALJ's handling of Dr. Qutob's note.

Bentschneider was questioned at the hearing about Dr. Qutob's note, which the ALJ gave "very limited weight" to because "the medical record does not support this type of kidney dysfunction or limitations." (Tr. 15). That finding is supported by substantial evidence as it accurately characterizes the record, and Bentschneider does not point to any medical evidence in the record to the contrary.[9]

In sum, substantial evidence supports the ALJ's finding that Bentschneider's gout, vasodepressor syncope, and hyperaldosteronism were not severe impairments that began prior to his date last insured and lasted continuously for the required 12-month period. Because the duration requirement is not met, the ALJ's finding that Bentschneider did not have a severe impairment is supported by substantial evidence.[10] *McCleary*, 2015 WL 9463194, at *4 (holding that substantial evidence supports the ALJ's finding that the plaintiff did not suffer from a severe impairment for a continuous 12-month period prior to the date last insured, so the plaintiff "cannot meet the duration requirement necessary to satisfy the requirements at step two"); *Lyons*, 19 F. App'x at 300 (affirming the district court's decision, in part, because the plaintiff's claims of heart disease and gastrointestinal problems did not rise to the level of disability under the Act, where the plaintiff's heart problems "did not commence until after the end of his insured status"

---

[9] Again, it was Bentschneider's burden to present evidence in support of his claimed disability.

[10] Bentschneider briefly argues that his impairments were "severe" because they interfered with his ability to work. (Doc. #9 at 14). But he ignores the duration requirement and fails to address how it is satisfied. For the reasons explained above, substantial evidence supports the ALJ's conclusions that that Bentschneider did not meet the duration requirement, so the ALJ's determination that Bentschneider is not disabled at Step Two is similarly well supported even if these impairments interfered with is ability to work. *McCleary v. Comm'r of Soc. Sec.*, No. 1:14-CV-1197, 2015 WL 9463194, at *4 (W.D. Mich. Dec. 28, 2015); *Lyons v. Soc. Sec. Admin.*, No. 00-5361, 19 F. App'x 294, 300 (6th Cir. Sept. 13, 2001); *Murphy v. Sec. of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986).

and his gastrointestinal problems "did not last continuously for the required 12-month period"); *see Murphy v. Sec. of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986).

### 2. Substantial Evidence Supports the ALJ's Credibility Determination

Bentschneider argues that the ALJ erred in evaluating his credibility because the ALJ's assessment lacks specificity, evidentiary support, and clarity.[11] (Doc. #9 at 16-18). In his view, "the only way an ALJ could deny benefits at step-two, under the applicable *de minimis* test, would be where an ALJ finds a claimant's testimony as *entirely* incredible and factually groundless."[12] (*Id.*) (emphasis in original). He argues that this is not the case here. (*Id.*). In response, the Commissioner argues that the ALJ "could not accept [Bentschneider's] subjective allegation that he was disabled" because it was unsupported by the limited record, which contained "unremarkable findings" and was "largely devoid" of complaints related to the conditions for which Bentschneider is seeking benefits. (Doc. #11 at 13).

The Sixth Circuit has held that determinations of credibility rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters,* 127 F.3d at 531. Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged

---

[11] Again, Bentschneider argues that objective medical evidence supports his argument, but he fails to cite to any portion of the record to illustrate this.

[12] Bentschneider does not cite to any case law, regulation, or statute in support of this assertion.

16

symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul. 96-7*, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

The ALJ's credibility determination in this case is supported by substantial evidence. The ALJ determined that Bentschneider was not credible based on an appropriate review of the pertinent medical records, Bentschneider's own statements and activities of daily living, and records by other physicians including medical consultant Donald Kuiper, M.D., and Hasan Qutob, M.D. (Tr. 14-15). Bentschneider does not point to what else the ALJ should have considered in addition to, or instead of, this evidence. Furthermore, the ALJ's assessment of Bentschneider's credibility as to the severity of his symptoms is properly based on a comparison between Bentschneider's statements and the evidence in the record. (*See, e.g.*, *supra* note 6).

As to Bentschneider's medical records that pre-date the date last insured, the ALJ reviewed records from December 2006 and April 2007, as detailed above. *See supra* at 11-15. The ALJ also properly considered Bentschneider's activities of daily living as they bear on his credibility. Bentschneider testified that he has lived alone for 21 years and is capable of caring for himself and maintaining his home. (Tr. 15, 29-30, 184-85). He also takes care of his mother. (Tr. 15, 184). Although Bentschneider testified that he uses a walker when his gout flares up, he admitted that it is not medically prescribed. (Tr. 15, 49, 183, 189).

In sum, in assessing Bentschneider's credibility, the ALJ properly considered the record evidence, including the relevant objective medical evidence, Bentschneider's statements and activities of daily living, and the opinions of other physicians, including a medical consultant.

The Court finds no reason to disturb the ALJ's credibility determination because the ALJ observed Bentschneider firsthand, and his evaluation of the severity of Bentschneider's symptoms prior to the date last insured is supported by clear and specific references to the evidence in the record.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Bentschneider's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: April 7, 2017  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829

F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 7, 2017.

        s/Eddrey O. Butts
        EDDREY O. BUTTS
        Case Manager